## A99A0276. SNIDER v. THE STATE.
### (516 SE2d 569)

ANDREWS, Judge.

Charles Michael Snider appeals from the denial of his motion for new trial after his conviction of guilty but mentally ill for child molestation, invasion of privacy, and cruelty to children.

1. Snider's third, fourth and fifth enumerations challenge the sufficiency of the evidence regarding the child molestation (Count 1) and invasion of privacy (Count 2) convictions[1] and are addressed first.

Count 1 alleged that between May 12, 1989, and October 4, 1990 (the day before K. S. turned 14), Snider did "immoral and indecent acts to and in the presence of [K. S.], a child under the age of . . . (14)" with intent to arouse and satisfy his sexual desires. Count 2 alleged that between May 12, 1992, and June 24, 1994, Snider did "go on or about the premises of and the private place of another, . . . : the bedroom of [K. S.], for the purpose of secretly observing her activ- ities. . . ."

Viewed with all inferences in favor of the jury's verdict, the evi- dence was that K. S. was the adopted daughter of Snider, who mar- ried her mother in 1981 when K. S. was five years old. Snider met Mrs. Snider at a convention of singles held by their church, The

---

[1] Snider enumerates denial of his motion for directed verdict as error and also chal- lenges the legal sufficiency of the evidence of this charge. The standard of review for a denial of a motion for directed verdict of acquittal when the sufficiency of the evidence is chal- lenged is whether, under the rule of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt the defendant guilty of the offenses charged. *Cantrell v. State*, 230 Ga. App. 693, 694- 695 (1) (498 SE2d 90) (1998); *Cody v. State*, 222 Ga. App. 468, 470 (1) (474 SE2d 669) (1996). Both enumerations therefore address the same issue.

Church of Jesus Christ of Latter Day Saints. The church practiced modesty, including the wearing by adult couples of "garments" given to them upon being married. The garments resembled underwear, extended to the knees, and were to be worn at all times unless bathing or swimming.

After Snider and Mrs. Snider married, he was transferred by the Air Force to England. While there, he repeatedly stood in his children's bedroom window and exposed himself to a female neighbor "[t]o see if she'd . . . show herself to me." He did not think there was anything wrong with it and described it as a "natural high, . . . look at what I've got, but you can't have it."[2]

The family moved to Cherokee County, Georgia, in 1987 and lived on Hickory Road. At that house, K. S.'s bedroom and that of her parents were on the upper floor. K. S., who was 11 at this time and beginning to develop physically, began to see Snider completely unclothed lying on the bed or standing in the doorway of his bedroom, sometimes touching his genital area. She reported this to her mother who talked to Snider about it. He admitted that he had done this, and Mrs. Snider talked to church elders who counseled with Snider.

The family moved to another house in 1989 where the master bedroom was on the main level and the children's bedrooms upstairs. In this house, it was necessary to walk by the master bedroom in order to get to the garage. K. S. continued to see Snider in his bedroom nude. He would make eye contact with her and then "freak out" and run into his bathroom. These incidents occurred once or twice a week from the time she was 11 until she was 14.

In August 1990, Mrs. Snider attended a weekend conference out of town and left K. S., then nearly 14 and fully physically developed, and her two younger brothers, Snider's natural sons, with Snider. On Saturday morning, Snider decided to make breakfast for his children in the nude because it was "something different." He went to K. S.'s bedroom door and knocked. K. S., in her t-shirt and shorts in which she slept, opened her door, saw him, slammed the door and remained in her room until late afternoon.

Thereafter, K. S. was suffering from a kidney infection and running a fever. She was told by Snider to get in a bathtub of cool water, which she did. She did not normally appear naked or bathe in front of Snider. Snider came into the bathroom and would not leave despite her protests. She asked for a towel, but instead he handed her three wash cloths with which she attempted to cover herself. He then sat on the side of the tub and swirled the water with his hand. He did not leave for approximately 30 minutes, after taking her temperature.

---

[2] This evidence was introduced as a similar act to show intent.

From the age of fourteen until sixteen, K. S. would see Snider nude in his room about three times a week. On one occasion in 1992, Snider directed her to go take a shower, which she did. She then went into her bedroom to dress and, while standing there without clothing, noticed Snider standing outside her bedroom window looking at her. Although she had blinds on her window, they were the incorrect size and even when closed did not obscure her room. She then dressed in her closet. Snider acknowledged that he stood outside the window in an attempt to see "if [K. S.] would expose herself to [him]."

On August 16, 1993, after sundown, Mrs. Snider was looking for her husband and could not locate him. She went into the backyard and found him standing nude, touching his chest and penis, and looking into K. S.'s bedroom window.

(a) The evidence of child molestation was legally sufficient for the acts committed prior to October 4, 1990. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Gunter v. State*, 215 Ga. App. 517, 519 (3) (451 SE2d 108) (1994).

(b) Snider argues that, because K. S. was a minor child and her bedroom was located in the home owned by him, he could not legally be guilty of invasion of her privacy because she had no expectation of privacy there and because he was standing in his own backyard.

OCGA § 16-11-62 (3) provides that it is unlawful for: "Any person to go *on or about the premises of another or any private place* for the purpose of invading the privacy of others by . . . secretly observing their activities." (Emphasis supplied.)

Private place is defined in OCGA § 16-11-60 (3) as "a place where one is entitled reasonably to expect to be safe from casual or hostile . . . surveillance."

Snider's contention that one does not reasonably expect privacy in her bedroom is not tenable. As held in *Kelley v. State*, 233 Ga. App. 244, 249 (2) (503 SE2d 881) (1998),

> As the Supreme Court of Georgia has noted, OCGA § 16-11-62 was intended to protect all persons from an invasion of privacy. *Ransom* [*v. Ransom*, 253 Ga. 656 (324 SE2d 437) (1985)]. There is no express exception for family members. The victim, although a minor, certainly was of an age to understand that she has a right of privacy in certain situations. And, it is logical to conclude that a 16-year-old girl would expect some privacy, even from her parents or guardians, when she was nude in the bathroom.

Such a rationale applies equally to the bedroom of a teenager who has just exited the shower and gone into her bedroom to dress.

This argument also underpins Snider's contention that the evidence of invasion of privacy was legally insufficient and that argument also fails.

2. Snider's first and second enumerations deal with denial of his special demurrer to the child molestation and cruelty to children counts of the indictment.

The child molestation count is set out in Division 1 above. The child cruelty count alleged that, "between the 5th day of October, 1990, and the 24th day of June, 1994, . . . [Snider] did unlawfully . . . cause a child under the age of eighteen (18) years, . . . K. S., cruel and excessive mental pain. . . ."

Snider specially demurred to the indictment on the ground that the two counts did not set forth what the immoral and indecent act was (Count 1) or what act Snider did to cause cruel and excessive pain to K. S.

Regarding a special demurrer,

"The true test of the sufficiency of the indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the *record* shows with accuracy to what extent he may plead a former acquittal or conviction." (Punctuation omitted; emphasis supplied.) *Jordan v. State*, 220 Ga. App. 627, 629 (470 SE2d 242) (1996). "It is useful to remember that the purpose of the indictment is to allow defendant to prepare his defense intelligently and to protect him from double jeopardy." *State v. Eubanks*, 239 Ga. 483, 484-485 (238 SE2d 38) (1977).

*State v. Forthe*, 237 Ga. App. 134, 136-137 (514 SE2d 890) (1999).[3]

When the date is not alleged as an essential averment of the crime charged, any offense of the nature charged which is shown by the evidence at trial and occurred within the statute of limitation, including the dates alleged in the indictment, is encompassed by the indictment. *Miller v. State*, 226 Ga. App. 509, 511 (2) (486 SE2d 911) (1997); *Robinson v. State*, 213 Ga. App. 577 (1) (445 SE2d 564) (1994). In such a situation, the State is not restricted to proof of a single

---

[3] *D'Auria v. State*, 270 Ga. 499 (512 SE2d 266) (1999) is factually distinguishable because it involved sexual battery by a doctor who was engaged in ongoing medical treatment of the victim who had consented to such medical treatment and the alleged improper touching was not specified.

transaction, but may prove or attempt to prove any number of acts of the nature alleged within the period, "although punishment upon conviction is limited to a single offense, and acquittal or conviction, upon proper plea, operates as a bar to further prosecution for any offense of the nature charged within the period. [Cits.]" *Grantham v. State*, 117 Ga. App. 444 (1) (160 SE2d 676) (1968). See also *Miller*, supra.

With respect to the statutory offenses of child molestation and child cruelty, the indictment followed the statutes and, when such offenses are charged,

> "(w)e think the terms of the statute on which the indictment is based distinctly individuate the defined offense[s] and that the use of those terms in the indictment is sufficient to give defendant reasonably certain notice of the specific acts charged and thus enable him to prepare his defense. (Cits.)" *Cragg v. State*, 117 Ga. App. 133, 134-135 (159 SE2d 717) (1968). "It has been broadly held that an indictment may charge lewd and lascivious conduct in general statutory terms without particularizing details which would be offensive to decency. (Cit.)" Id.

*Burnett v. State*, 202 Ga. App. 563, 564-565 (2) (415 SE2d 43) (1992). See also *State v. Black*, 149 Ga. App. 389, 391 (4) (254 SE2d 506) (1979).

These offenses are much different from the charges in *Military Circle Pet Center No. 94 v. State*, 181 Ga. App. 657 (353 SE2d 555) (1987), relied upon by Snider, in which the generic term "neglect" was used and held to give insufficient notice of the charges. *State v. Kenney*, 233 Ga. App. 298, 300 (1) (b) (503 SE2d 585) (1998).

*Judgment affirmed. McMurray, P. J., and Ruffin, J., concur.*

DECIDED APRIL 21, 1999 —
RECONSIDERATION DENIED MAY 12, 1999.

*Conrad & Abernathy, Eric A. Ballinger*, for appellant.

*Garry T. Moss, District Attorney, Rachelle L. Strausner, Assistant District Attorney*, for appellee.